Thank you, Your Honor. Joy Hercardillo appearing on behalf of the Greer Coalition and the Center for Biological Diversity. I understand I'm responsible for my own clock, but I just want to mention at the outset that if I'm able to do it, I'd like to reserve a couple minutes for rebuttal. Turning to the merits of this appeal, in our opening brief we identified six distinct legal issues that we believe are raised in the appeal. But essentially what this appeal revolves around are two analyses that the Forest Service relied upon in approving this proposed land exchange that we believe are just fundamentally flawed and render that decision arbitrary and capricious. And those two analyses are the amended geological resources report, and I'm sure I'm going to bumble that periodically, but it's the analysis of the hydrology of the area and the impact that reasonably foreseeable development would have on the local water table. And then the second analysis is the appraisal of the federal properties. I'd like to begin by talking about the amended geological resources report. Now, significantly this report was prepared on remand because Judge Merguia had previously found that the Forest Service had failed to adequately analyze the impact that reasonably foreseeable development would have on the local water supply. And Judge Merguia not only found the previous analysis inadequate, but also instructed the Forest Service to do an EIS, a full EIS, because of the significance of this issue. So on remand, initially the Forest Service went ahead and did an analysis, but they used a computer model that was based entirely on assumptions. There was no hard data at all in the analysis. And in the public comment period, several commenters raised this flaw in the analysis, in this significant problem. Among them, chief among them, the head of hydrology at the University of Arizona, Thomas Maddock. Dr. Maddock was very critical of the analysis because of its reliance on assumptions when hard data was available and recommended in his comments that at least some testing be done so that it wouldn't be just a simply theoretical exercise. Similarly, a hydrologist from the Hopi tribe submitted comments and was also critical of the unnecessary reliance on assumptions. And Ms. Lopez actually suggested that the Forest Service conduct draw-down tests with monitoring and then submit the analysis. After they'd redone the analysis, submit it to the public for comment and feedback. Now the Forest Service, after the close of the comment period, did undertake to do some testing. But instead of doing the draw-down testing, which Ms. Lopez had suggested, instead they opted to do slug tests, which by their own admission in this geological report do not provide much information about the characteristics of the aquifers. Well, that's critically important here because as Dr. Maddock had pointed out in his comments, the aquifer, the information about the aquifer from people reporting problems with wells, having to re-drill wells, suggested that it was not as uniform as the model was assuming and that in fact there may be fluctuations and differences in transmissivity. Bottom line, they did slug tests, which are cheap and easy. They only tested three wells. The data from one of the wells was unreliable, so they tossed it out. Now keep in mind there are 285 existing wells in this area, so there were ample wells for them to test, even if they were just simply going to rely upon the slug tests. They give no explanation in the amended report as to why they declined to do a draw-down test. It's a relatively easy test. It takes days as opposed to hours, as the slug test does, but it gives you much more. You're arguing against the slug test. It seems to me you're arguing with the manner in which the Forest Service decided to carry out this study or this test. Isn't that what it amounts to? That's correct, Your Honor. Isn't that a decision? Well, I assume it's at least partly scientific. It is scientific. Isn't that? Now, what are you saying? The Forest Service's scientists are inept or incapable or what? There's a better way to do it? What are you saying? They didn't do enough? They should have done more? Yes, Your Honor, that other information, more information was available with other tests, and they chose to use an inferior test and did not explain or provide information as to why the other test was not used. Well, counsel, we have quite a few cases that speak to the general theme that we're not in the business of deciding between scientists or among scientists where the issue is could something better or different have been done. How do you prevail in view of that general principle? I recognize that general principle, Your Honor, but the NEPA regulations do require that if information is essential to make a reasonable evaluation, that that information needs to be obtained, and that, in this case, are the characteristics of the aquifer. Well, you know, you're sort of giving two different answers because in answer to Judge Tashima's question, you said, well, they could have done better. There was a better technique available. And now you're saying, well, they didn't get any adequate information. And those are two very different things. To say, well, they used a method that wasn't as good as the one that I want is quite different than saying they neglected it altogether. That's correct, Your Honor. So thank you. But let me clarify that because the problem with the slug test, as the Forest Service acknowledged in its report, is that it does not give full and complete information. So it's not just a qualitative difference. It's a quantitative difference. What is missing? What is absent? The characteristics of the aquifer. Meaning what specifically? Meaning how transmissive is the aquifer? Are there gaps in the aquifer or impediments in the aquifer? That kind of information that would allow this analysis to be meaningful. I'm looking at the record. The slug test is quick and dirty. You throw in what amounts to a big rock. Correct. You see how soon, how fast the water goes out, and then how fast it comes back when you pull the big rock up. But the drawdown test is, at least from the record as I can ascertain it, is doing the same thing by pumping water out. I apologize, Your Honor, because I am not a hydrologist. But what the hydrologists say is it's over an extended period of time, and it does provide more information. That, I believe, is acknowledged in the geological resources report. But we don't, the slug test, as opposed to the drawdown test, is only one problem with this report. There's also the problem that even if they opt to do the slug test, doing it on two wells, neither of which are in the area of concern where the homeowners live who are concerned about their water supply, that also is problematic. Excuse me. The test that was rejected, at least from the record, was rejected because when they threw the slug in, the water went out so quickly they couldn't measure it. Correct. So if anything, at least that slug test would indicate a result higher than the 26, which was in the higher of the two wells. That's correct, Your Honor. But also the location of the wells is problematic. But I don't want to get bogged down because there are other more critical problems with this. There's one more thing on this point, Counselor. Yes. And I would, at least from my own point, if you say that the averaging was kind of silly, but then the Forest Service uses the lowest number and says, even with that, we're okay. Now, that's a fairly conservative approach. That's correct, Your Honor. I think the other problems that we've pointed out with the Geological Resources Report is that it fails to take into account the 285 other wells that are in the aquifer in the model. And more importantly, it also, the analysis, both with respect to the groundwater pumping and the impact on the water table, but even more importantly on the nearby riparian areas, the Forest Service incorrectly assumes that there's going to be recharge from septic tanks if this property is developed. But as we've pointed out in our briefs, in the sanitation district that the property is located in, the water, the wastewater, in fact, would be transported downstream and treated. I don't think that's a certainty with the wildcat development, is there? In other words, some wildcat, you know, individual developers might not connect to that. Your Honor, that — I'm sorry. I didn't mean to interrupt you. The wildcat development expression simply means it's completely legal. Wildcat developers are required to comply with building codes and so forth. It's simply a way to get around the requirements for a structured subdivision. So there's nothing, nothing that suggests that this wildcat, if this property is developed under a wildcat scenario, that these people would not be required and would, in fact, have to — Given that you're right, that this was analyzed incorrectly, what difference does it make to the outcome? In other words, is the error harmless? No, Your Honor, we don't believe the error is harmless. This Court has held in Native Ecosystems v. U.S. Forest Service that an EIS that relies upon incorrect data is a violation of NEPA. And this analysis, particularly with respect to — Are you saying that harmless error analysis doesn't apply? I'm saying that we know that the — That's a yes-or-no question. I'm sorry. Does harmless error analysis apply to an error in describing the state of the world? In terms of — I know you want a yes or no. Can I try and explain? When I say — First say yes or no, and then you can explain. No. No. Harmless error doesn't apply here because the responsibility to do this analysis based on accurate scientific data, that responsibility first and foremost is with the Forest Service. So if the Forest Service says there are 92 native species of plants when there are actually 94 native species of plants, everything has to start over, even though the error doesn't affect anything? I'm not sure I would call that harmless error, per se. Why not? It's wrong. It's wrong. In my hypothetical? In your hypothetical. But it's a small thing wrong compared to all the other things that are there. That is correct. So why did this problem affect the substantive analysis that was done? This problem affected the substantive analysis because when they looked at the riparian areas and looked at the flow, they calculated and then cut it in half. Now, even in — this is in the biological assessment, and we — I spelled this out in our reply, but when they halved that amount, even at the reduced amount of flow, they found that there may be an impact on species. So twice the — in essence, the impact is double in terms of the reduction in the stream flow in the riparian areas. So it's not an insignificant error. It's a 50 percent error. Well, but what about the other — you know, the other assumptions that the Forest Service made in this report? The other — Assuming that's erroneous, couldn't that error be offset by these other assumptions? It may well be offset, Your Honor, but there's nowhere in the EIS or in any of the record documents where that conclusion is addressed and reached by the Forest Service. I think that's the reason Judge Graber is raising her question in terms of harmless error. Can we look at that and say, well, it was harmless? With all due respect, no, Your Honor. It's the responsibility of the Forest Service, their experts, to do the hydrological analysis. We've identified errors in the analysis, and at this point, it's the responsibility of the court to remand it back down, not to do its own hydrological analysis. And, essentially, this hydrology issue has been of concern to the people of Greer from the get-go. From the time this exchange was announced, the people in Greer have been concerned about their water supply and whether this is going to impact that. They're entitled, under the law, to an accurate, thorough, fair assessment of what that potential impact is, and that's all we're asking for. It may well be that when this, if this got remanded back down, the court might, or the service might conclude, reach the same conclusion. But NEPA requires that it be based on accurate scientific information. I see I'm running out of time quickly, so I want to touch just briefly, if I may, on the appraisal issue. And I think at the outset, it's important for me to mention that if this is remanded back down on the NEPA issues, then this court need not even reach the appraisal issue, because just by passage of time, the appraisals would have to be redone. But our problem with the appraisal of the Federal properties, and I appreciate that we've gone into excruciating detail in our briefs, and it's a lot of numbers. The bottom line, the concern is that the property is not, the valuation of this property does not fully take into account the Greer location and the premium that ascribes to the property because of that location. I think the most egregious error in the appraisal is the failure to address anywhere that sale of the 2003 sale of 8.16 acres, literally abutting tract A. That sale was not mentioned. It wasn't included in a comparable, but it also wasn't mentioned at all anywhere by the appraiser. And she was instructed by the Forest Service to include all sales that were considered and rejected. So we're not necessarily even arguing that this should have been a comparable, but the property sold for $53,000 an acre in 2003, and this property was appraised at $25,000 an acre. Many years later, now we recognize we're talking a 70-acre parcel versus an 8-acre parcel, but even when you make adjustments for the size, there's still just this glaring problem with this appraisal. I see I have two minutes left on the clock. Just a little less, yes. We'll let you save it. Thank you, Your Honor. Good afternoon, Your Honors. Nicholas Demasio on behalf of the United States Forest Service, and may it please the Court. I'd like to provide just a couple of minutes' worth of important background information on the land exchange that's at issue in this case before proceeding to address the specific issues that Plaintiff's Counsel just argued about. The land exchange that's involved in this case would allow the Forest Service, the Forest Service has concluded that this land exchange would benefit the environment by allowing it to acquire three private inholdings within the Apache-Citries National Forest. What these inholdings are, are they're small tracts of land that are otherwise surrounded by the National Forest, and by acquiring these parcels, it would protect them from further development. There is evidence in the record that one of these parcels was attempted to be developed in the past, and so the risk of development here is real. By acquiring these parcels, the Forest Service would facilitate habitat restoration, species recovery, and protect water quality. By contrast, the two federal parcels that are offered in exchange for these three private inholdings lie along the main road into the small town of Greer. They're adjacent to existing development, and they constitute just 2% of the 16,000 acres of recreational land immediately adjacent to the Greer area. They contain no riparian areas, no wetlands, and no threatened or endangered species are known to inhabit any of these parcels. Based on all of these facts, it's unsurprising that a group such as the Nature Conservancy was willing to weigh in in favor of this exchange. The plaintiffs here are organizations whose members either recreate on these lands or own land adjacent to the federal parcels. As Plaintiff's Counsel just described, they raised two primary attacks on the Forest Service's decision to go forward with this exchange. First, they attacked the Forest Service's appraisal of the federal parcels involved, and second, they claimed that the Forest Service did not properly evaluate the possible impacts to the local shallow aquifer in the unlikely scenario that these federal parcels are developed via 258 individual one-acre sales. Because plaintiffs focused most of their time on that second issue, I'll do the same. On that issue, it's important for the Court to remember that this is a purely hypothetical situation. There is no proposed development plan for either of these parcels. What the Forest Service did to evaluate this situation is it commissioned a report by a Ph.D. in hydrogeology, Dr. Roger Congdon. What he did is he performed essentially what was a worst-case analysis of what might happen in the unlikely scenario that these federal parcels are developed via 258 separate one-acre sales. Now, the reason why I say that this was a worst-case analysis is because, as is described in the final EIS and Dr. Congdon's report, Dr. Congdon cited scientific literature to assume conservative values for every single factor within his model. So, for example, he assumed the immediate drilling of 258 individual shallow wells, even though the Forest Service's analysis of historical development rates in Greer only showed that it was likely that 25 parcels would be developed within the next 15 years. So to put that into perspective, what that means is that even in this unlikely scenario, it would be 150 years before you would have 258 new shallow wells in that aquifer. It sounds to me like you're almost making a harmless error argument. No. What we're — what I'm trying to — the point that I'm trying to make here is to show that Dr. Congdon's model assumed very conservative values for all of these — these — the factors that went into his model. Now, I — Well, what about his — what about his analysis or his report about what your appointment complained about, about, you know, on the septic recharge? Sure. You concede that's erroneous? No, we do not concede that that is erroneous. That was a proper assumption for Dr. Congdon to make. Tell us why. That was proper because, for one thing, I'd like to point out that the plaintiff cites no legal authority that these — that these individuals, these new homes, would have to connect to the local sanitary sewer system. There's no — So you dispute that they have to or that they would, huh? We dispute both, that they have to. And in this particular hypothetical scenario, where you have 250 individuals deciding to sink a shallow well into the shallow aquifer, it was a perfectly reasonable assumption for Dr. Congdon to assume that they would opt to install a septic system instead of going to the more — to the greater expense of paying to extend the sanitary sewer lines to each of their homes on an individual basis. That was a perfectly acceptable assumption for Dr. Congdon to make in that — in that scenario. The plaintiffs have cited no legal authority that they would be required to hook up into the sanitary sewer system. And beyond that, since we're on this subject, I'd like to address the harmless error. The local regulations are not in the record, right? I mean, as to whether they would have to hook into the sanitary system or not, we don't know the answer to that. That's — well, that's correct. On this briefing, there is no — Well, I'm not asking about the briefing. I'm asking about the record, which is a different question. Are the local regulations or zoning requirements or whatever in the record that would demonstrate whether or not these people would have to, if they do develop, hook into the sanitation system or would have the option for septic tanks or — No, Your Honor. Those records are — they're not in the record. The plaintiff has pointed to no such requirement. But neither have you. So everybody's guessing, right? The development report, there is a — the only place where I've been able to find that this is mentioned in the record is in the Forest Service's original development report, and that's at Supplemental Excerpt of Record, page 12. And it specifically states, by regulations, sanitary sewer can be provided either by individual on-site disposal or by central collection and treatment. But the final EIS also says that each lot would be required to install a septic tank that would then be connected to LCSD's collection system for treatment at its facility. They would be required to install a septic tank, but I think that second portion is of the interconnection. What I believe the record reflects is that the Forest Service noted that the individuals would be required to pay for interconnection. That's not what it says. It says — At ER 369, the septic tank would then be connected to the system for treatment at its facility. That's an assumption — maybe an assumption as part of the final EIS's analysis, but I don't believe that that states it's a legal requirement. So is that a mistake in the EIS? And if so, what do we do with that? I don't believe it's a mistake, Your Honor. Again, I think what we need to do here is step back and understand that what Dr. Congdong was doing was trying to develop an analysis of what might happen in a particular hypothetical scenario, and the Forest Service's final EIS is then discussing what the possible impacts are in the similar scenario, but there's no indication here that there was a legal requirement for these folks to connect to the sanitary sewer system. Well, let me ask you this, though. If that's true, why would the Forest Service make that assumption that they would? And if the Forest Service makes that assumption that they would, isn't that a reasonable assumption that we should follow? I think the Forest Service was analyzing both scenarios, is the point, right? Dr. Congdong was assuming, let's say they install septic tanks. What's going to happen in that situation? The final EIS is analyzing another scenario where potentially they would interconnect to the sanitary sewer system. But I don't think either is — No, but they're talking about the same factual situation on which this report is based in, namely that under a certain type of scenario, lot owners would install their own septic tanks, right? Sure. Sure. For some reason, the Forest Service assumes then they would connect, whether they're required to or not, to the sewer district's collection system. Your Honors, okay. For purposes of this argument, I understand this is a complicating factor. But what I want to point out is that this is a very small part of a subcomponent of Dr. Congdong's analysis. He made no assumption of septic recharge when he was evaluating the draw down to the local shallow aquifer. That's an excerpt of Record 89. And then — Let me ask a question I'm getting at. Assuming this is a true or reasonable assumption, then can it be offset like something that's akin to harmless error? Yes, it can be. So let's assume for purposes of argument that it was wrong in this one small component. The only place where this comes in is with respect to modeling the impacts to the local — to surface waters. Okay, so as I just pointed out, this has nothing to do with the draw down to the local shallow aquifer. Excerpt of Record 89 shows that he didn't assume any septic recharge for that portion of his analysis. It's only with respect to stream flow that he assumed this. So it's a small part of a subcomponent of his analysis, and it is totally offset by all of the other conservative assumptions that he made in his model. Most specifically, the amount of recharge that would go into the aquifer from rainfall. He assumed only a half a percent of recharge from rainfall in that portion of his analysis, and that was in comparison to the studies that he cited that showed that he should have been assuming from 3 percent to 5 percent of recharge from rainfall. So that's a dramatic underestimation of the amount of recharge from rainfall in that part of his analysis. And if you look at Excerpt of Record 97 to 98, the charts show what the draw down to the aquifer would be when you assume higher levels of recharge from rainfall. So that can give you an idea of how big of an impact this assumption of a low amount of recharge has on the model. So we do believe that it's a harm. If there is any error with respect to the 50 percent septic recharge, that it is a very small error and that it is harmless. And contrary to the arguments of opposing counsel, we cited two cases that specifically state that in the NEPA context, harmless error does apply. That's County of Del Norte v. United States and City of Sausalito v. O'Neill. This is a very small part of an otherwise very robust analysis, and I would urge Your Honors not to get too hung up on this small issue. Because as I was saying earlier, there are so many conservative assumptions in this model. The fact that Dr. Kongnong assumed 258 new shallow wells immediately, the fact that he assumed year-round pumping, even though the Forest Service's analysis showed 86 percent of Greer residents are seasonal, the fact that he only assumed 0.25 to 0.5 percent recharge from rainfall, even though the studies that he cited showed that he should have been assuming 3 percent to 5 percent of rainfall, the fact that he assumed a 0.05 storage coefficient for the aquifer, even though he cited several scientific studies that showed that a range of values all the way up to 0.3 was more likely, he did his very best to make sure that every parameter that he assumed in this model was conservative. And that's what NEPA requires. The plaintiffs are really, they think that the Forest Service should have gone out and got more information. Well, that's not what NEPA requires. They said in their opening brief that NEPA has a best available science standard. It has no such standard. According to Lands Council v. McNair, an agency is at liberty to use on-the-ground analysis if it believes it's appropriate, but it is not required to do so. This Court has on multiple occasions upheld agency decisions based purely on modeling alone, and what those cases say is that as long as the agency states the conclusions that it draws from its chosen analysis and shows why it believes the effects to be reasonable, that ends the Court's analysis. This is an extremely technical area of scientific inquiry. The agency specifically showed why its analysis was reasonable here. Dr. Kongnong cited study after study in his reports that showed that the values that he was assuming were conservative. And the Court simply doesn't have the basis to order the Forest Service to go out and conduct more testing on this issue. But would you agree that, I mean, averaging two numbers, 26 and 2, and then coming up with the average and then saying that is representative of the entirety, that's a little bit silly? Although when you make your argument and you say you'll take the lowest number and say that's representative, it's certainly more sensible. Your Honor, if that's all the agency had done was just average two numbers, maybe you would have a point. But that's not what the purpose of that testing was. That's not all the testing showed. Okay. What the testing, the follow-up testing that the agency performed showed is that the very lowest number that they were able to find for a transmissivity figure, right, the plaintiffs were concerned that the transmissivity near the existing development, this Crosby-Akers development, might be too low. So they tested three wells in that surrounding area. And what that testing showed is that the very minimum value that they found was in line with Dr. Congdong's original assumption, 500 feet squared per day. That was the Owens well. They also tested a well within the Crosby-Akers development. So I don't understand what the plaintiffs are saying when they say that the Forest Service didn't test a well in the area. They tested the Iverson well is in the Crosby-Akers development. And that was the one that recovered so quickly that they couldn't get a specific number. But Dr. Congdong, in his report, specifically states that the quick recovery at that well shows that the transmissivity in that area was above average. Okay. And the third well that they tested also showed an above average transmissivity figure. So for all three of these wells, there was no indication of a below average transmissivity for this area. What that subsequent testing did is it confirmed that the previous assumptions that Dr. Congdong had made based on the scientific literature were, in fact, conservative. And that's what NEPA requires. Dr. Congdong showed that his conclusions were reliable by citing scientific literature to assume conservative parameters for his model. The plaintiffs haven't identified any body of contrary scientific literature. They haven't identified any specific evidence in the record except for some brand-new arguments in their reply brief about well records that are both administratively unexhausted and unraised in their opening brief. Counsel, before you run out of time, what is your response to the issue of the appraisal not considering the abutting land offer? That 2003 sale that they're raising is a non-issue. That sale was both older. Okay. So the appraiser specifically stated that she was going to look back five years because she had found a sufficient number of newer sales in order to accurately assess the value of the parcels. That's at excerpt of record 233. And the review appraiser concurs at supplemental excerpt of record 238. So she says she's going back five years because there's enough newer sales that she doesn't have to go back any older, to any older sales. Your opponent argued, seems to think that, well, she either agreed or she was required to state why she disregarded that sale. She did state it. Well, she did not. She did state that she was going back five years because she didn't need to go back any further than five years because she found sufficient newer sales. The 2003 sale, as the district court said, was more than five years old. That's why it doesn't appear anywhere in the appraisal. She didn't list every sale that she looked at that she eliminated because it was more than five years old. She doesn't list that. She doesn't have to. There is a – there are at least two concepts in looking at comparable properties. One has to do with the time at which the sale is made, but the other has to do with its comparability. Sure. So if I'm appraising my house, there may be, you know, ten houses that sold half a mile away, but maybe my neighbor's house is more like mine. And I think that's what they're getting at, that that aspect of geographic proximity wasn't explained, why that didn't trump the age when the comparability was great or otherwise. Right. I think that's exactly what the plaintiffs are trying to do, is they are trying to establish a rule that proximity trumps the age and the size. It's not a rule. Well, they said that there's something that's more comparable than what you used in this instance. That's not a rule. They're just saying you had something a lot closer. Your Honor, it was also not just too old. It was also way too small. It was 8.13 acres. That's smaller than several of the parcels that the appraiser refused to consider. But the problem is that's not a reason the appraiser gave for not considering it, right? For that lack of comparability, just, you know, there's no statement there. Well, that's because it was, again, that's because it's too old. And, again, this harmless error analysis would apply in this circumstance, too. I just have to say, she specifically stated that she eliminated three greer sales because they were too small. One was 9.5 acres. One was 3 acres. One was 17 acres. The federal parcels here are 70 acres and 267 acres in size. And she specifically discusses the effect that the smallness of the size of a parcel can have on the exchange. She states an excerpt of record 283 to 284. She shows that small parcels get a disproportionate price per acre, okay? So if you combine the size of that 2003 sale, which was only 8.13 acres, with the fact that it was more than five years old, there's simply no basis to remand so that an appraiser could simply state, yes, you're right, according to the exact same reasoning I applied consistently throughout the rest of my appraisal, this sale also wouldn't have been relevant. And they do not cite any specific legal authority, whether it's a case, a statute, a regulation. If you look at their opening brief, they cite no authority for the arguments that they're making. And in their reply brief, despite their best efforts, they have not been able to identify any case or any regulation that says that proximity trumps size or age. Counselor, you have exceeded your time. Okay. Thank you. Unless there's any further questions. Again, I would just like to make one final statement, that the reason that the Forest Service has been so doggedly pursuing this exchange for the past 10 years is because it's very considered judgment. This is going to be an extremely beneficial exchange for the forest. And I would urge Your Honors to take a look again at their analysis on those issues. Thank you, Counsel. You have a little bit of rebuttal time remaining. I just want to make a couple very brief points. First, with respect to the hookup requirement in the Sanitation District, the Forest Service in the Supplemental Excerpts of Record, page 185, and later, shoot, I just lost my page, in the decision of the Appeal Deciding Officer, also in the Supplemental Excerpts of Record, both places note that the hookup to the Sanitation District is required, and they rely upon that in their water quality evaluation. So they can't have it both ways. I mean, they essentially say, we don't have to worry about water quality or contamination, because, look, these houses would be hooked up to the Sanitation District. So they very much establish, particularly in the page that I unfortunately just took my finger out of, they even reference where it is established in the 2003 study that this is a requirement. With respect to this whole argument about whether there's an offset, I just want to emphasize what we raised in our reply, which is this is post hoc rationalization going on here. These problems, particularly the septic recharge problem, with that supplemental or amended report didn't come to light until after the decision was made, because the Forest Service chose not to submit that to public comment. They did the amended report, they made their decision, and nobody knew about this, and there was no opportunity to bring these problems to light before the decision was made. And then with respect to the 2003 sale, again, in the Excerpts of Record, page 227, the appraiser indicates that she is going to look at sales over a 10-year period and principally focus on three to five years. So it is within the scope of the time frame that she said she was going to look at sales. Finally, my final comment, the risk of error here is being borne entirely by the citizens, both human and non-human, of Greer. If the Forest Service is wrong about these impacts to the water table, once this property is in private hands, it's in private hands. It can be developed. And if it turns out that this is a marginal aquifer, not the uniform aquifer that Dr. Condon has assumed it is, it's the people in Greer and the animals in Greer that are going to pay that price. Thank you. Thank you, counsel. The case just argued is submitted, and we appreciate the arguments of both counsel, and I also want to welcome the students from Mills College who heard part of the argument and excellent lawyers on both sides. You had a wonderful example of good lawyering to watch. With that, we will stand adjourned.
judges: Garbis, Tashima, Graber